# BYRON TULLAR *v.* HENRY BAXTER, HORATIO HORSKIN, JOSEPH HINERTH, WILLIAM AND LUCY KEYES.*

## [IN CHANCERY.]

*Water Rights. Mill Owners. Riparian Owners. Equitable Contribution to Maintain Dam. Deeds, Construction of.*

1. The equitable principle, that when several persons enjoy a common benefit, all must contribute rateably to the discharge of the burdens incident to the existence of the benefit, does not apply, where the deeds of conveyance establish the rights of each of several mill owners, and define their liabilities as to contribution in maintaining a dam, in which all have a common interest.

2. And contribution will not be decreed against one of them whose mill privilege is not used, and there is no probability that it ever will be.

3. DEEDS, PRACTICAL CONSTRUCTION OF, BY PARTIES. Where several mill owners, having derived their titles from a common grantor, have an interest

---

* Heard, January Term, 1886.

Tullar *v.* Baxter.

in a reservoir dam, and for many years have given a practical construction to their deeds, in that some have contributed towards the maintenance of the dam, and others have not, the court will consider such construction in defining the deeds.

4. COMMON RESERVOIR. RIGHTS OF MINORITY. Where one by representing a majority interest is authorized to determine as to repairs of the dam, he is under the duty to decide fairly and conduct the work prudently.

5. MULTIFARIOUSNESS. A bill is multifarious which seeks relief of one kind against one defendant, and another on different grounds against the other defendants. But this objection must be raised before final hearing.

6. COSTS. Some inadmissible evidence of trivial importance was put in by both parties, but the court declined to restrict the costs.

BILL IN CHANCERY. Heard on the pleadings, proofs and motion to suppress, September Term, 1885, ROYCE, Chancellor. It was decreed without hearing and *pro forma* that the bill be dismissed.

*C. G. Austin* and *Burt, Hall & Burt*, for the orator.

The orator is entitled to relief in a court of equity. Ang. Wat. ss. 444, 457 ; Gould Waters, 540 ; *Lyon* v. *McLaughlin*, 32 Vt. 423 ; *Sanborn* v. *Braley*, 47 Vt. 170. The parties are under a common duty to maintain the dam. Gould Waters, ss. 307, 540 ; *Bradfield* v. *Dwell*, 48 Mich. 9 ; *Dorman* v. *Prince*, 40 Barb. 213 ; *Clark* v. *Plummer*, 31 Wis. 442 ; *Sanborn* v. *Braley*, 47 Vt. 170 ; *Campbell* v. *Mesier*, 4 Johns. Ch. 333. Each party had a common right and interest in the dam. Gould Waters, 307.

*Cross & Start* and *Farrington & Post*, for the defendants, argued that the bill was multifarious ; and that the liabilities of the parties were determined by the deeds, and hence no occasion for equitable relief.

The opinion of the court was delivered by

POWERS, J. This is a bill in equity asking the court, among other things, to fix and declare the relative liabilities of the parties hereto to share in the expense of rebuilding and maintaining the dam across the Missisquoi river at Keyes' Falls in Highgate.

It appears from the pleadings that the Missisquoi river, in the locality in question, runs northwesterly and then westerly past the mills and shops of the orator and the defendants, particularly described in the pleadings, and that the water power supplying said mills and shops is furnished by means of a dam across said river.

All said mills are located on the southerly and westerly bank of the river in the following order : The orator's saw-mill just below said dam ; the defendant Baxter's grist-mill, called in the pleadings the old grist-mill, next below ; the defendant Baxter owns the foundation of which is called the " new mill," next below the old grist-mill ; and the defendants, Horskin & Hinerth, own the foundry property, so called, next below. The defendants, Baxter and Keyes, also own mill privilege below the foundry property, which has never been used, and also own a privilege on the north side of the river just below said dam and nearly opposite the orator's saw-mill, which was formerly used, but has not been utilized for more than twenty-five years last past. All the owners of the mills and shops on the southerly bank of the river now in use have certain rights in the use of water which are particularly expressed in their title deeds ; and we think the liabilities of the parties to expense necessary to the maintenance of said dam are also clearly defined in said deeds.

August 25, 1857, Stephen S. Keyes was the owner of said dam and all the mills, shops, water privileges and lands on both sides of said river, and on that day conveyed the property called the foundry property to one Norval D. Wait by warranty deed. The foundry property so conveyed has come down by regular conveyances to the defendants, Horskin & Hinerth. At that time, as now, the saw-mill took its water by means of a bulkhead in said dam, and thence by a flume to said mill. The grist-mill took its water from said dam by a flume running from the dam to said grist-mill ; and the foundry property took its water by means of a trunk or aqueduct leading from the grist-mill flume to said property.

The deed aforesaid from said Keyes to said Wait was the first conveyance in time and the first severance of the water rights made by the common owner of the whole; and after describing the granted premises recites that on the granted premises are a foundry, machine shop and other buildings, and that " said Wait is to have the machinery in as well as all the privileges and appurtenances connected with the buildings upon said premises, together with the right to himself, his heirs and assigns, of taking water from the new grist-mill building to the premises hereby conveyed by means of a trunk, as the water is now conveyed to said premises; and the water privilege hereby granted is to be upon an equality as to the right of using the water with any privilege now used, or which may be hereafter granted and used at said Keyes' Falls, excepting the old grist-mill, which is to have priority as to the use of the water, as hereinafter mentioned; and should the said Keyes, his heirs or assigns, discontinue or fail to support a flume to said grist-mill buildings, said Wait, his heirs and assigns, are to have the privilege of taking water, and by the same means as above described, from the old grist-mill, to be taken from the old grist-mill flume at the same point that it is now taken from said flume, and conveyed in the same place as it is now conveyed to and past said grist-mill building; and should said Keyes, or his heirs or assigns, discontinue or fail to maintain a flume from the dam to the old grist-mill, then said Wait, his heirs and assigns, are to have the privilege of taking water in the manner above described from the dam, to be taken and conveyed in the same places where it is now taken and conveyed; but so long as said flumes are continued and maintained by said Keyes, and his heirs and assigns, where they now are, said Wait, and his heirs and assigns, are to take water as aforesaid from said grist-mill building as it is now taken."

The deed then gives Wait free ingress to said grist-mill building to repair his gate, and makes certain reservations and conditions, and then continues, " and this grant is made upon this other express condition, and with this other express reservation, that the old grist-mill, with the machinery now in the same, or which may be hereafter put into the same, is to enjoy priority of privilege and water, and whenever the operation of said mill, with its present machinery, or such as may hereafter

be put into the same, shall require it to be done, the said Wait, his heirs and assigns, are to shut down their gate or gates upon request of said Keyes, his heirs or assigns; and said Wait, his heirs or assigns, are so to use said privilege as not to cause any unnecessary waste of water, and the said Keyes, his heirs and assigns, are to support a flume to the new grist-mill building until said building shall as above deemed as unfit for use as it now is."

Stephen S. Keyes retained the title to all said property not conveyed to said Wait until his death in 1867, after which the same passed to his widow, Deborah S. Keyes, who, on the 7th day of November, 1867, conveyed the premises now owned by the orator, by warranty deed to one Lorenzo Olds.

As the orator now holds the title and rights then conveyed to Olds it is necessary to look into that deed.

After describing the granted premises the deed recites that: " The said Olds, and his heirs and assigns, are to have the privilege, and the same is hereby conveyed to them, of using and taking water from the pond into his flume or flumes through head-gates of like dimensions with them now used and for said saw-mill; but in no case are said head-gates to be set lower or cut wider than those now used, except as hereafter mentioned; and the said Olds, his heirs and assigns, are to have the privilege, and the same is hereby conveyed to them, of drawing and using water from their flume or flumes at any point not more than three feet below the bottom of the present flume to said mill; and in no case are they to draw water through an opening or openings which in the aggregate shall exceed one thousand square inches; * * * and it is expressly stipulated that the water privilege hereby conveyed shall be on an equality in the use of water, with privileges now existing or hereafter to be granted from this pond, except said grist-mill; and it is expressly understood that said grist-mill shall at all times have a priority in the use of water from the pond, and that the same priority in the use of water shall extend to any other grist-mill erected instead of the present one, and using no more water; and whenever the operation of the said grist-mill shall require it, the said Olds, and his heirs and assigns, shall shut down said saw-gate or gates upon the request of said Keyes, her heirs and assigns; and it is expressly

understood that in case the grist-mill flume and head-gate are made lower at the dam than they now are, then the said saw-mill flume and head-gate at the dam may be lowered the same distance; and in case any other flume and head-gate shall be built lower at the dam than the said saw-mill flume and head-gate, then said saw-mill flume and head-gate may be lowered the same distance; and * * * the said Olds for himself, his heirs and assigns, agree at all times to be at one-half as much expense in the building and repairing the dam as the grist-mill may be. * * * It is expressly understood that all questions in regard to rebuilding or repairing the dam shall be decided by a majority interest for said dam; * * * and it is expressly understood that nothing in this deed is intended to convey more or greater water power or privilege than one thousand square inches—meaning that the water shall be taken through an aperture or apertures of not more than the size of one thousand square inches at the point herein described for its measurement; and it is not intended to guarantee or secure any amount of water to said Olds, his heirs or assigns, but only to permit him to take water in common with other privileges, except the grist-mill, as before described, which have been, or may hereafter be, granted; and the privileges herein granted shall be subject to water privileges granted from the pond heretofore."

The defendant Baxter has succeeded to the title of Mrs. Keyes to said grist-mill and its water privileges and rights as against the orator standing on the deed to Olds, and Horskin & Hinerth standing on the deed to Wait. And said Baxter, jointly with said defendant Lucy Keyes, owns all the balance of said property originally owned by their common grantor, Stephen S. Keyes. In 1883 it became necessary to rebuild the dam, and Dr. Baxter, representing the majority interest, and with the approval of the orator, undertook the work and carried it forward to practical completion.

The orator does not urge that the work ought not to have been done, but avers that the defendant Baxter was himself incompetent, and his employees disqualified for work of this character. It is true as claimed, that the defendant, though representing the majority interest, and therefore authorized to

determine all questions respecting contemplated repairs, must respect the minority interest so far as to decide fairly and conduct the work prudently for the common advantage of the entire interest; and the proofs in the case do not show a contrary practice on his behalf.

The orator insists that, although as between him and the owner of the grist-mill the ratio of expense for repairs is fixed and determinate, the question is open to defendants Horskin and Hinerth in respect to the foundry property, and as to defendands, Baxter and Lucy Keyes, in respect to the unused privilege below the foundry property, and the unused power opposite the saw-mill on the north side of the river; and presses the familiar equitable principle, that where several persons are in the enjoyment of a common benefit, all must contribute rateably to the discharge of those burdens that are incidental to the existence of such benefit.

But the case is not one for the application of this doctrine. It is true that the orator and Horskin and Hinerth are on an equality in the use of water; and if nothing more appeared they should equally share in the expense necessary to preserve such use. But although they stand on the same level, so far as the use of water is concerned, they are placed on an inequality so far as the burden of expense in the preservation of that use is concerned; and this inequality inheres in the very title to such use of water which they have respectively accepted and now stand upon. If their rights are legally fixed by their deeds there is no room for the application of the equitable rule above referred to.

In the first place the deed to Wait, under which Horskin and Hinerth hold their title, imposes no burden for repairs upon the dam, while the deed to Olds, under which the orator holds, imposes the burden of repairs at one-half what the owner of the grist-mill must pay. Whatever may be, or whatever ought to be the amount to be paid by the grist-mill property, either as established by title deeds or equitable principles, the orator must pay one-half thereof. If the grist-mill has a

legal right for contribution by the foundry property or other ownership, the half chargeable to the orator is correspondingly reduced; but if the grist-mill property has no legal right to such contribution the orator must abide the ratio fixed by his deed. As to the unused privileges, the grist-mill property clearly has no claim for contribution. No such right by deed is claimed. None in equity can exist; because equitable contribution flows from community of enjoyment of the common benefit. The lower privilege has never been used, and the one on the north side has not been enjoyed since Olds took his title; and the proofs show that no probability exists that either will be used hereafter. Equity cannot fasten contribution upon a mere possibility of benefit; it can act only upon its actual existence. The orator can stand no better in this behalf than the owner of the grist-mill. If the orator could thus get relieved, no reason is apparent why he could not charge every riparian owner below him with the unwilling proprietorship of a water privilege, the use of which he never contemplated, and the existence of which he may never have suspected. If the orator can enforce contribution upon the foundry property, it cannot inure wholly to his benefit, because that would destroy the ratio of expense which he has assumed by his deed to the owner of the grist-mill. He can share in it, if enforceable, with the grist-mill only in the ratio of one to two.

But Wait took his deed clear of any obligation to repair the dam. Keyes even contracted to keep the new grist-mill flume in repair so long as that building remained fit for use, and only permitted Wait to take water at points higher up, towards, and at the dam, upon the contingency that Keyes, his heirs and assigns, should fail to keep up and maintain the flumes below the dam, from which Wait was to take water.

Although Keyes does not, in express terms, obligate himself to keep the dam in repair for Wait's benefit, still the expressions in his deed to Wait, "should the said Keyes, his heirs and assigns discontinue or fail to support a flume to said grist-mill building," then Wait may take water from the old grist-

mill flume, and " should said Keyes, his heirs or assigns, discontinue or fail to maintain a flume from the dam to the old grist-mill," then said Wait may draw from the dam, clearly imply that Keyes understood that the duty to maintain the flumes rested upon him, and that Wait was to use the instrumentalities that Keyes had provided to conduct water to his own mills as the source of supply for the foundry property so long as Keyes kept them in operation. The evidence shows that so long as Keyes lived he, and not the owners of the foundry property, kept the dam in repair, thus giving a practical construction to the deed, harmonizing with the expressions above quoted, and both carrying a strong implication that the duty to repair the dam was wholly upon Keyes and his successors.

And after the death of Keyes and the sale of the saw-mill to Olds, down to 1883, the owners of the grist-mill and saw-mill have made all such repairs without protest, and without pretense of claim, that said duty ought to be shared in by others. In the deed to Wait he is placed on an equality in the *right* to use water with other privileges that may be granted. This does not put him on an equality as to the *quantity* to be used. In his deed the quantity of water he may use is not measured or restricted further than it shall be subordinate to the grist-mill right.

In the deed to Olds he is restricted to one thousand square inches. The deed to Wait imposes no duty, in terms, upon him to repair the dam. The deed to Olds expressly obligates him to make such repairs, and fixes his relative share of the expense. The deed to Wait was made when Keyes had the whole ownership of all the powers and had the whole duty of maintaining the dam. Under such circumstances, if he expected Wait to contribute to the expense of repairs upon the dam, he would naturally have so stipulated in his deed. On the contrary, however, he assumes himself the duty of maintaining the flumes which furnish his own supply, and without which his own supply would be cut off, and gives Wait the mere

right to take water in subordination to him from his flumes. In view of all these features of the case we are clearly of opinion that the fair construction of Wait's deed exempted him from any duty to contribute with Keyes to the expense of repairing the dam, and this exemption must continue so long as the grist-mill supply is maintained as it now is. And his exemption arising from the deed under which he takes the water, there is no room for the application of the doctrine of equitable contribution.

Some formal objections were made in argument which are of minor importance in the view we have taken of the merits of the case. It is urged that the bill is multifarious, in that it seeks relief of one kind, and on special grounds against Baxter alone, another on different grounds against the other defendants. This objection is well founded, but is taken too late. The court will not entertain such an objection first taken at the final hearing if it can make a decree disposing of the case on its merits. *Wade* v. *Pulsifer*, 54 Vt. 45.

Some inadmissible evidence was put in by both parties, but it is largely of trivial importance, and hardly sufficient to warrant any restriction upon costs.

The *pro forma* decree of the Court of Chancery dismissing the orator's bill is affirmed with costs, and the cause remanded.